UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF INDIANA
SOUTH BEND DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| v. | ) | Case No. 3:16-CR-057 JD |
| | ) | |
| CARLOS MAEZ | ) | |

REPORT AND RECOMMENDATION

I. Introduction

Defendant, Carlos Maez ("Maez"), is charged with armed robbery in violation of 18 U.S.C. § 924(c). He is alleged to have robbed the Old National Bank branch ("Old National") located at 1404 East Ireland Road, South Bend, Indiana, on October 16, 2015. At the time of the robbery, Shelby Modjeska ("Modjeska") and Krystal DeFault ("DeFault") were working as tellers at Old National. Following Maez's arrest, but without being prompted by law enforcement investigators and without consulting one another, Modjeska and Default accessed the websites maintained by the Sheriffs of Elkhart and St. Joseph Counties. After reviewing numerous arrest records on these websites, both Modjeska and DeFault independently identified Maez on the St. Joseph County Sheriff's website as the person who robbed the Old National on October 16, 2015. On November 2, 2015, both tellers advised their branch manager that each had identified the suspect by using the internet. On November 9, 2015, they also advised an agent of the Federal Bureau of Investigation ("FBI") of their actions to identify the suspect, and the FBI agent decided not show a photo or display a photo array to either teller.

Pursuant to Federal Rules of Evidence 403 and 404(b), Maez has moved to suppress all evidence with respect to any pretrial identification by Modjeska and DeFault using the Sheriff's website. In his motion, Maez suggests that the process used by the tellers to identify him is

inherently suggestive and that the only manner in which this suggestive identification process may be remedied is to exclude any testimony by the tellers regarding their pretrial identification of Maez.

The defendant's Motion to Suppress [DE 20] is before me, the undersigned Magistrate Judge, having been referred by an Order [DE 21] of the District Court for a Report and Recommendation pursuant to 28 U.S.C. §§ 636(b)(1)(B), Fed. R. Crim. P. 59(b)(1), and N.D. Ind. L.R. 72-1. I held an evidentiary hearing on the defendant's motion to suppress on January 30, 2017. At the hearing, both Modjeska and DeFault testified as well as FBI Agent Thomas Weber ("Weber"), and the parties introduced relevant exhibits. (Gov. Ex. 2 & 3; Def. Ex. A - E).

At the conclusion of the hearing, I took the instant motion under advisement to allow the parties to file supplemental briefs. The deadline for the last brief to be filed was February 27, 2017,[1] and this matter is now ripe for my consideration. For the reasons stated herein, I RECOMMEND the defendant's motion to suppress or exclude evidence be DENIED.

## II. Relevant Facts and Inferences

In making the following findings of fact, I have considered the briefs of the parties, the evidence presented, and the credibility of the witnesses. The evidence in the file and admitted at the hearing established the facts as outlined below:

On October 16, 2015, a white male with a thin build and wearing a blue Notre Dame baseball cap, a gold-colored Notre Dame jacket, dark-colored jeans, dark-colored shoes, and a false beard robbed the Old National branch located at 1404 East Ireland Road, South Bend,

---

[1] Maez had until February 13, 2017, to file his brief. Due to an oversight by Maez's counsel, the brief was not filed until February 14, 2017, and the Government moved to strike the brief. After considering the circumstances, I found that Defense counsel's inadvertence was unintentional and that the Government would not be prejudiced by the late filing of the brief, and I allowed Maez to file his brief one-day late. However, due to delay in filing and resolving the motion to strike, I granted the Government additional time to file its response. No extension of time was allowed for Defense Counsel to file a reply, and none was requested.

Indiana. [DE 30 at 9-11]. On the day of the robbery, Modjeska and DeFault were the tellers on duty at Old National. [*Id.* at 44]. The robber first approached DeFault. [*Id.* at 45, 72-73]. When the robber pulled out a gun, DeFault ducked behind a counter and was kneeling with her hands up. [*Id.* at 73]. Modjeska had been assisting a customer at the drive-thru window, and turned around after she heard DeFault gasp. [*Id.*]. When Modjeska turned around she saw DeFault was on her knees, and the robber was at DeFault's Station. [*Id.* at 46]. Modjeska directed the robber to come to her teller station, and she proceeded to give him all of the cash from her drawer. [*Id.* at 46-47]. After Modjeska moved to her teller station, DeFault stood up with her hand raised and moved behind Modjeska. [*Id.* at 73]. While Modjeska was "assisting" the robber, DeFault "stared and memorized as much as [she] could about his face and clothing he was wearing." [*Id.*]. At the robber's insistence, Modjeska escorted the robber to the bank exit. [*Id.* at 47]. At the hearing, Modjeska described the robber as 5'8'' or 5'9", thin, maybe 150 pounds, brown hair, dark eyes." [*Id.* at 48]. She had previously described him as shorter – between 5'4" and 5'6" tall. [*Id.*]. DeFault had described the robber as approximately 5'3" tall based on his height in comparison with Modjeska. [*Id.* at 74].

Both Modjeska and DeFault stated that the robber wore a fake, glue-on beard. [*Id.* at 48, 73]. Modjeska remembered the beard was attached with a lot of paste. [*Id.* at 48-49]. DeFault said it made his face look deformed, like he had been burned or scarred. [*Id.* at 73]. Modjeska stated the disguise blocked portions of the robber's eyes, but his nose, eyes and other parts of his face were readily observable. [*Id.* at 63-64]. DeFault noted that the fake beard only covered the chin line of the robber's face. [*Id.* at 73]. Following bank protocol, DeFault completed a suspect description form at the bank before law enforcement or anyone else spoke with her about the robbery. [*Id.* at 70-71].

Following the robbery, Agent Weber of the FBI was assigned to investigate. [*Id.* at 10]. Several days after the robbery, a tip was received by the South Bend Area Crime Stoppers program, and the tipster identified Carlos Maez as the bank robber. [*Id.* at 13]. Relying on that information, Agent Weber obtained photos of Maez and background information about Maez, and spoke with people who knew Maez. [*Id.*]. Shortly thereafter, Agent Weber showed a video to Maez's parole officer, Marshall Hayes ("Hayes"), and Hayes identified Maez from the video. [Id. at pp. 16]. Additionally, Agent Weber presented a still photograph of Maez at the Old National to Kaila Tappia ("Tappia"), Maez's daughter, and she identified Maez as the individual in the photograph. [*Id.* at 16-17].[2] Maez was eventually apprehended and held in the St. Joseph County jail.

The robbery was covered by the local news. [*Id.* at 52]. Photographs of the robber were released to the local news and were broadcast. [*Id.*]. At some point, the tellers learned that the robber had been apprehended. [*Id.* at 52-53, 55]. Modjeska's husband told her that the sheriffs maintain websites of prisoners, and she began to research suspects on the Elkhart and St. Joseph County websites. [*Id.* at 53-54]. After reviewing numerous photographs over a period of days, Modjeska located a photograph that she was confident looked like the robber. [*Id.* at 63]. When Modjeska returned to work on November 2, 2015, she advised the bank manager that she had identified Maez as the bank robber by using the St. Joseph County Sheriff's website. [*Id.* at 58-60]. The same day, DeFault also advised the bank manager that she had independently identified the robber using the same website. [*Id.*].

In fact, without consulting with law enforcement, the bank or Modjeska, DeFault had

---

[2] Agent Weber also showed a photograph to Maez's sister, but she subsequently died and cannot be a witness in this proceeding. [DE 30 at 14-16].

4

been checking the Sheriffs' websites in Elkhart and St. Joseph County using her personal smartphone. [*Id.* at 79-80]. DeFault was aware of these websites because a former boyfriend's stepfather worked at the St. Joseph County jail and she had searched that website before. [*Id.* at 83]. She was unable to find anything on the Elkhart County website, so she searched the St. Joseph County website. [*Id.* at 79]. Searching by arrest date, DeFault continued to review records until she found the photo of the person she knew was the robber. [*Id.*]. Once DeFault located the photograph, she "knew without a shadow of a doubt that was the gentleman [who robbed the bank]." [*Id.* at 81]. DeFault had looked at between 20 and 50 photographs before locating Maez as the bank robber. [*Id.* at 84].

The Court notes that each Sheriff's website contains various identifying information about each jail inmate in addition to a photograph. In Maez's case, the information did not indicate that Maez was being held as a suspect for bank robbery. Rather, the website indicated that Maez was being incarcerated on a "hold." [*Id.* at 60].

On November 9, 2015, Agent Weber contacted the two tellers because he wanted to arrange a photo array for the purpose of identifying the robber. [*Id.* at 25-26]. However, when he called the two tellers they advised him that they had discovered that Maez was the robber by looking on the website of the St. Joseph County Sheriff. As such, Agent Weber decided not to conduct a photo array or a lineup with the two tellers. [*Id.* at 27-28]. To date, neither Modjeska nor DeFault have been shown photos or a photographic lineup of suspects by the FBI or any other law enforcement agency. [*Id.* at 65, 85-86]. Prior to his involvement in this case, Agent Weber was unaware that the local sheriffs maintain jail websites that contain photographs and information about jail inmates. [*Id.* at 26-28].

During the hearing, I found that, based on their demeanor while testifying, the witnesses,

Modjeska and DeFault, were credible and reliable. I also found Agent Weber's testimony to be comprehensive, credible, and corroborated by the testimony of Modjeska and DeFault and the exhibits.

### III. Analysis and Conclusions

"The [U.S.] Constitution…protects a defendant against conviction based on evidence of questionable reliability, ***not by prohibiting introduction of the evidence***, but by affording the defendant means to persuade the jury that the evidence should be discounted as unworthy of credit." *Perry v. New Hampshire*, 565 U.S. 228, 237, 132 S.Ct. 716, 181 L.Ed.2d 694 (2012) (emphasis added). "Only when evidence 'is so extremely unfair that its admission violates fundamental conceptions of justice,'… [has the U.S. Supreme Court] imposed a constraint tied to the Due Process Clause." *Id.* [quoting *Dowling v. United States*, 493 U.S. 342, 352, 110 S.Ct. 668, 107 L.Ed.2d 708 (1990)]. In those instances, the knowing use of false evidence by the government runs afoul of the Due Process Clause because such use offends "any concept of ordered liberty." *Id.* [quoting *Napue v. Illinois*, 360 U.S. 264, 269, 79 S.Ct. 1173, 3 L.Ed.2d 1217 (1959)].

Supreme Court jurisprudence regarding pretrial identification emphasizes that due process concerns arise only when law enforcement officers use an identification procedure that is both suggestive and unnecessary. *Manson v. Brathwaite*, 432 U.S. 98, 107, 97 S.Ct. 2243, 53 L.Ed.2d 140 (1977); *Neil v. Biggers*, 409 U.S. 188, 198, 93 S.Ct. 375, 34 L.Ed.2d 401 (1972). Even when the police use an identification procedure that is improper, exclusion is not the inevitable consequence. *Brathwaite*, 432 U.S. at 112-13; *Biggers*, 409 U.S. at 198-99. Rather, courts should assess on a case-by-case basis whether improper police conduct created a "substantial likelihood of misidentification." *Brathwaite*, 432 U.S. at 116; *Biggers*, 409 U.S. at

6

201. "[R]eliability is the linchpin" of the courts evaluation of the witness' identification. *Brathwaite*, 432 U.S. at 114. Only where the corrupting effect of police misconduct outweighs the ability of a witness to make an accurate identification should the identification be suppressed. *Id.,* 432 U.S. at 114-16. Otherwise, assuming the evidence is admissible in all other respects, the identification evidence "should be submitted to the jury." *Perry*, 565 U.S. at 240. In other words, where the "crucial element of police overreaching," *Colorado v. Connelly*, 479 U.S. 157, 163, 107 S.Ct. 515, 93 L.Ed. 473 (1986), is absent, the alleged misidentification should be subjected to the crucible of cross examination and an ultimate credibility determination by the finder of fact. Furthermore, merely creating a "risk that a witness may see a publicly distributed photo does not automatically create a substantial likelihood of subsequent irreparable misidentification" that is not subject to correction by cross-examination. *United States v. Johnson*, 859 F.2d 1289, 1296 (7th Cir. 1988) (publication of defendant's photograph in connection with a prior bank robbery did not reach due process threshold to exclude tellers' identification of defendant in subsequent, unrelated bank robbery). In fact, "the 'admission of evidence rarely implicates due process,' as courts typically rely on other means – such as the Sixth Amendment rights to counsel and confrontation – to safeguard the reliability of evidence." *Lee v. Foster*, 750 F.3d 687, 691 (7th Cir. 2014) (quoting *United States v. Sanders*, 708 F.3d 976, 983 (7th Cir. 2013); s*ee also United States v. Nunez-Guzman*, 554 F.App'x. 507, 511-512 (7th Cir. 2014) (showing driver's license photo rather than booking photo was not unduly suggestive); *United States v. Jones*, 454 F. 3d 642, 649 (7th Cir. 2006) (duplicate viewings of suspect photo was not unduly suggestive where viewings were done a month a part, involved dozens of photos, and did not involve external, suggestive influence by law enforcement); *Stewart v. Duckworth*, 93 F. 3d 262, 265-66 (7th Cir. 1996) (showing photo more than once did not render procedure

7

unduly suggestive); *Montgomery v. Greer*, 956 F.2d 677, 681 (7th Cir. 1992) (failure to preserve photographs used in photo array did not demonstrate undue suggestiveness where witness viewed a good number of photos and mug books outside presence of police); *cf. Gregory-Bey v. Hanks*, 332 F. 3d 1036, 1045 (7th Cir. 2003) (repeated presentation of only one suspect by police to witness orchestrated a process that was unduly suggestive); *Israel v. Odom*, 521 F. 2d 1370, 1373-74 (7th Cir. 1975) (repeated presentation of a single sketch of the suspect by police to witness was unduly suggestive).

To determine if the identification procedure reaches the threshold of a "substantial likelihood," the courts engage in a two-prong analysis. *Perry*, 565 U.S. at 240. First, the court determines whether the identification procedure was suggestive and unnecessary. *Id.* Next, the court determines, under the totality of the circumstances whether the procedure was nonetheless reliable. *Id.* In making these decisions, the court should consider five factors in determining whether an identification is reliable:

    (1) The opportunity to view.
    (2) The degree of attention.
    (3) The accuracy of the description.
    (4) The witness' level of certainty.
    (5) The time between the crime and the confrontation.

*Brathwaite,* 432 U.S. at 115–16. Applying the *Brathwaite* standard to the facts in instant case is straight-forward: (1) both Modjeska and DeFault had ample opportunity to observe the robber during their lengthy interaction at the time of the robbery; (2) while both Modjeska and DeFault paid close attention to the robber, DeFault actually took special care to memorize everything about the facial features of the robber; (3) absent the variance for height, both Modjeska and DeFault accurately described the robber and their descriptions are consistent with that of the Defendant Maez; (4) both witnesses are confident of their description and identification, but

DeFault is certain beyond a shadow of a doubt; and (5) while no "confrontation" actually occurred, the time between the robbery and the tellers identifying Maez's photograph on the internet was approximately two weeks.[3] *See United States v. Fryer*, 974 F.2d 813, 822 (7th Cir. 1992) (post-robbery identifications made three weeks, two months, and two and a half months afterwards were reliable).

Applying a commonsense approach to the facts here, there is nothing to suggest that law enforcement agents engaged in any misconduct. In fact, as noted by all of the witnesses, the FBI had never shown a photograph or photo array to the eyewitnesses. The tellers, Modjeska and DeFault – independently and without prior consultation with law enforcement, the U.S. Attorney's office or each other – reviewed the websites of the Elkhart and St. Joseph County Sheriffs for the robbery suspect. Based on their close and careful observation of the suspect at the time of the robbery, both tellers were able to identify Maez from the photograph on the website maintained by the St. Joseph County Sheriff. Based on these facts, law enforcement did not affirmatively use an identification process that was suggestive or unnecessary, and did not place any external pressure on the witnesses to identify Maez from the photos on the internet.[4] In fact, law enforcement investigators did not engage in any conduct to cause the eyewitnesses to identify a suspect. As such, there is no evidence of improper police misconduct on the part of Agent Weber or any of the investigators that would necessitate exclusion of the tellers' identification of the Defendant on Due Process grounds. *Brathwaite*, 432 U.S. at 114-16. Furthermore, even assuming for the sake of argument that the identification was somehow

---

[3] Both Modjeska and DeFault independently advised their bank manager by November 2, 2015, that they had identified independently the bank robber. The robbery had occurred on October 16, 2015, which the Court notes is 17 days from the date that the tellers advised their manager that they had identified the robber from his photograph on the internet. Obviously, their actual identification had to occur before November 2nd.

[4] With the proliferation of photographs on the internet, it will become increasingly difficult to avoid inadvertent identification by crime victims or witnesses.

suggestive, the pretrial identification of Maez was otherwise reliable based on the *Brathwaite* factors. *Id.* at 115-16.

This finding, however, does not end our inquiry because the Defense suggests that law enforcement engaged in passive conduct that violated the Defendant's Due Process rights. The Defense argues that the booking website maintained by the Sheriff is fundamentally prejudicial to the Defendant and that the inmate photo combined with a list of pending charges is inherently suggestive to potential witnesses who visit the website. In other words, the Defense implies that this website constitutes police misconduct, *per se*. However, as noted by *Johnson*, merely creating a "risk that a witness may see a publicly distributed photo does not automatically create a substantial likelihood of subsequent irreparable misidentification" that is not subject to correction by cross-examination. *Johnson*, 859 F.2d at 1296. Based on these facts, Maez's remedy is cross-examination of the witnesses rather than exclusion of their testimony. *Id.*; *Perry*, 565 U.S. at 245-48.[5]

## IV. Conclusion

There is nothing in the record of this case to show that police misconduct in the pretrial identification process create a very substantial likelihood of irreparable misidentification – or inappropriate suggestiveness – that would rise to a violation of the Due Process Clause of the U.S. Constitution. Rather, the record demonstrates that the FBI agent exercised great discretion in avoiding any taint on the witness identification. The witnesses' use of the internet – albeit accessing the Sheriff's website – to identify the robbery suspect did not implicate any type of

---

[5] The Defendant's motion requests exclusion of the pretrial identification on the basis of FRE 403, which provides: [t]he court may exclude relevant evidence if its probative value is substantially outweighed by a danger of one or more of the following: unfair prejudice, confusing the issues, misleading the jury, undue delay, wasting time, or needlessly presenting cumulative evidence." As the original referral did not include the FRE 403 issue and as that motion implicates trial testimony, I have not discussed the FRE 403 implications in my Recommendation. However, the analysis of unfair prejudice should be similar to the analysis outlined above.

10

police misconduct. As Due Process rights have not been violated, the Defendant's remedy is the crucible of cross examination rather than exclusion. As such, the motion to suppress should be denied.

For the reasons stated herein, I **RECOMMEND** Defendant's Motion to Suppress [DE 20] be **DENIED**.*

Dated: April 21, 2017.

s/Michael G. Gotsch, Sr.<br>
Michael G. Gotsch, Sr.<br>
United States Magistrate Judge

---

* Any objections to this Report and Recommendation must be served and filed within fourteen (14) days after service of a copy of this recommended disposition on the objecting party. Fed.R.Crim.P. 59(b)(2). Such objections must conform to the requirements of Rule 59(b)(2) of the Federal Rules of Criminal Procedure. Failure to file objections within the time specified waives the right to appeal the District Court's order. *Thomas v. Arn*, 474 U.S. 140, 150 (1985); *United States v. Hall,* 462 F.3d 684, 689 (7th Cir. 2006) ("When a right is waived, it is not reviewable, even for plain error"). Only specific objections are reserved for appellate review. *Lockert v. Faulkner*, 843 F.2d 1015, 1018 (7th Cir. 1988); *United States v. Harris,* 470 F. App'x 504, 506 (7th Cir. 2012).